Andrew Weisbecker, Esq., OSB No. 030491
MARLER CLARK. L.L.P., P.S.
1301 Second Avenue, Suite 2800
Seattle, WA  98101
Phone: 206-346-1888
Fax: 206-346-1898
Email: aweisbecker@marlerclark.com

Attorney for plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CHRISTOPHER COLLINS, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br>a Delaware Corporation,<br><br>Defendant. | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND** |

COMES NOW the plaintiff, Christopher Collins, ("plaintiff"), by and through his undersigned attorney of record, asserting claims against the defendant, Chipotle Mexican Grill, Inc., a Delaware Corporation, ("defendant"), and states and alleges as follows:

## I.     PARTIES

1.     The plaintiff is a resident of Lake Oswego, Oregon, and is, thus a citizen of the state of Oregon for purposes of diversity jurisdiction.

2.     The defendant, Chipotle Mexican Grill, Inc., is a corporation organized and existing under the laws of Delaware, with its registered agent at 160 Greentree Dr. Ste. 101 Dover, Delaware. Chipotle, together with its subsidiaries (collectively the "Company") is, therefore, a citizen of the state of Delaware for purposes of diversity jurisdiction.

3.      The Company develops and operates fast-casual, fresh Mexican food restaurants. As of June 30, 2015, the Company operated 1,847 Chipotle restaurants throughout the United States.

4.      At all times relevant to the allegations in this complaint, the Company was registered to do business, and did conduct business, in the State of Oregon.

## II.    JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the defendant has certain minimum contacts with the State of Oregon such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

6.      Venue in the United States District Court for the District of Oregon is proper pursuant to 28 USC § 1391(a) (2) because a substantial part of the events or omissions giving rise to the plaintiff's claims and causes of action occurred in this judicial district, and because the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III.    GENERAL ALLEGATIONS

**Current Chipotle *E. coli* Outbreak**

7.      As of Wednesday, November 11, 2015, the investigation into an outbreak of *E. coli* illnesses by the FDA, Centers for Disease Control and Prevention (CDC), along with state and local officials in Oregon and Washington State, has linked 39 reported cases to Chipotle restaurants in Oregon and Washington.

8.      In Washington, residents of Clark (12), Cowlitz (3), Island (2), King (6), Skagit (5), and Whatcom (1) counties have been reported as outbreak cases. Of the 29 Washington cases, nearly all of them have reported having been at Chipotle restaurants before getting sick. Eleven of

the Washington residents were hospitalized. Ill persons range in age from one to sixty-seven.

9. There are five Washington restaurants associated with this outbreak: Hazel Dell, 7715 NE 5th Avenue, Suite 109, in Vancouver; 1404 Broadway Avenue and 4229 University Way NE in Seattle; 512 Ramsey Way 101 in Kent; and 1753 S. Burlington Blvd. in Burlington.

10. The Oregon Health Authority is reporting ten cases of Shiga toxin *E. coli* O26 linked to eating at Chipotle in the Portland Metro area. In Oregon, people in Multnomah, Clackamas, Washington, Columbia, Benton, and Deschutes counties have reported symptoms. Among the Oregon cases, three have been hospitalized.

11. Five locations in Oregon are involved, all of them in the Portland Metro area: Cascade Station at 9687 N.E. Cascades Parkway; Washington Square at 9120 S.W. Hall Blvd.; Lake Oswego at 8 Centerpointe Dr.; Tanasbourne at 2048 N.W. Stucki Ave., and Sunnyside in the Clackamas Town Center.

12. In total, 43 Chipotle restaurants have been closed in the two states.

13. As the Oregon Health Authority, Washington State Department of Health, Food and Drug Administration, and CDC are working with local health departments in the Portland metro region, and in other Oregon Counties, the Washington Department of Health Food Safety Program staff is working to establish criteria for the restaurants in Washington State to reopen.

**Prior Chipotle Foodborne Illness Outbreaks**

14. In September 2015, Minnesota Department of Health and Minnesota Department of Agriculture investigators reported an outbreak of *Salmonella* Newport among customers of 17 different Chipotle restaurants located primarily in the Twin Cities metro area, with one in St. Cloud and one in Rochester. Meal dates ranged from August 16 to August 28, 2015. Illness onset dates occurred between August 19 and September 3. As of September 16, 2015, there were 64 outbreak-associated cases. Nine persons required hospitalization.

15.     In August 2015, Ventura County Environmental Health and Ventura County Public Health Division staff investigated an outbreak of Norovirus among patrons of a Chipotle restaurant located in the Simi Valley Towne Center. During the week of August 18, 2015, about 80 customers and 18 restaurant employees reported symptoms. Laboratory testing of patient specimens confirmed the presence of Norovirus.

16.     In September 2009, a cluster of patients who had been infected with an indistinguishable strain of *E. coli* O157:H7 was identified. Initially case-patients were identified in Colorado, Utah, and New York State. The Colorado case-patients had all eaten at the same Chipotle Restaurant in Boulder, Colorado, on September 4, 2009. In Utah, all case-patients had eaten at the Cafe Rio Restaurant located in Salt Lake City, Utah, between August 31 and September 4, 2009. The New York State case patient had similarly eaten at a Chipotle Restaurant. A case control study involving Utah and Colorado case-patients found that eating romaine or iceberg lettuce was associated with risk of illness. A traceback of the romaine lettuce led to a common harvester/shipper, Church Brothers, LLC, located in Salinas, California.

17.     In April 2008, patrons of a Chipotle Grill Restaurant near Kent State University in Kent, Ohio, developed diarrhea, nausea and vomiting due to Norovirus. Many of those affected were Kent State University students who had eaten burritos at Chipotle. Restaurant coupons were given in exchange for donating blood, which resulted in a large number of exposures and illnesses.

18.     In March 2008, persons who dined at the Chipotle restaurant located in La Mesa, California, between March 1 and April 22, 2008, developed hepatitis A. Restaurant employees were tested for hepatitis A subsequent to the outbreak and had no evidence of recent hepatitis A infection. No source for the outbreak was definitively determined.

## *E. coli* **O26**

19.     *E. coli* O26 is grouped with other non-O157 Shiga toxin-producing *Escherichia coli*

(STEC). Incidence of non-O157 STEC, including O26, is increasing because of increased laboratory capacity for its detection.

20. Non-O157 STEC has been reportable since 2000 and, since then, STEC O26 has accounted for 26 percent of all non-O157 STEC cases.

21. STEC are an important cause of diarrhea and the major cause of post-diarrheal hemolytic uremic syndrome.

**Symptoms of an *E. coli* O26 Infection**

22. *E. coli* O26 infection is characterized by the sudden onset of abdominal pain and severe cramps, followed within 24 hours by diarrhea. As the disease progresses, the diarrhea becomes watery and then may become grossly bloody –bloody to the naked eye. Vomiting can also occur, but there is usually no fever. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically 3 to 9 days, although shorter and longer periods are not unusual. In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems.

**Complication of an *E. coli* O26 Infection**

23. Hemolytic Uremic Syndrome (HUS) is a severe, life-threatening complication of an *E. coli* O26 bacterial infection. Although most people recover from an *E. coli* O26 infection, about 5-10% of infected individuals go on to develop HUS. *E. coli* O26 is responsible for over 90% of the cases of HUS that develop in North America. Some organs, such as the kidney, pancreas, and brain, appear more susceptible than others to the damage caused by these toxins, possibly due to the presence of increased numbers of toxin-receptors.

24. Thrombotic Thrombocytopenic Purpura (TTP) is a clinical syndrome defined by the presence of thrombocytopenia (low blood platelet counts) and microangiopathic hemolytic anemia. This has generally been recognized as "adult HUS." There are many possible causes, including *E. coli*

O26, all of which act through the common mechanism of inducing endothelial cell damage. The damage triggers a cascade of biochemical events that ultimately leads to the characteristic feature of TTP—widespread dissemination of hyaline thrombi, which are composed predominantly of platelets and fibrin and block the terminal arterioles and capillaries (microcirculation) of most of the major body organs, commonly including the heart, brain, kidneys, pancreas and adrenals. Other organs are involved to a lesser degree. The pathophysiology of this disease results in multisystem abnormalities and the clinical manifestations of the syndrome.

**The Plaintiff's Illness**

25.     The plaintiff is a thirty-two year old resident of Lake Oswego, Oregon, where he lives with his wife, Kellie Collins.

26.     On October 23, 2015, the plaintiff purchased and consumed a chicken bowl at the Chipotle Mexican Grill located at 8 Centerpointe Dr, Lake Oswego, OR 97035.

27.     Two days later, the plaintiff began to experience nausea, headache, stomach cramps, diarrhea, and general fatigue. And over the next couple of days, the plaintiff's symptoms progressively worsened. He began to carry a temperature of 100°F, his now frequent diarrhea turned bloody, and he began to experience vomiting. Onset of the plaintiff's symptoms caused him to lose much sleep at night.

28.     On October 28, after experiencing bloody diarrhea for four days, the plaintiff became extremely worried about his condition and sought medical treatment at the Providence Bridgeport Immediate Care in Tigard, Oregon.

29.     While at Providence, the plaintiff was sent to seek emergency medical treatment at Legacy Meridian Park Emergency Department in Tualatin, Oregon, which he did.

30.     The plaintiff submitted a stool sample to the Legacy Emanuel Lab in Portland, Oregon, which tested positive for Shiga toxin 1. This test result was reported to the Oregon State Public Health Lab.

31.     Following his diagnosis, the Clackamas County Department of Communicable Diseases contacted and asked the plaintiff questions about his symptoms and what foods he had eaten. The questions were both general and specific as to the plaintiff's meal at the defendant's restaurant.

32.     The plaintiff was seen again for medical treatment at Providence Medical Group Mercantile in Lake Oswego, Oregon on November 2, for a clinic visit with his primary care physician as he continued to experience symptoms.

33.     The plaintiff was required to miss work on Thursday, October 29, because of his *E. coli* O26 infection, and continues to miss work to this day. The plaintiff's wife, Kellie, has not been able to work since Chris became ill because of the care that he needs and because of the fear that she has experienced since learning that *E. coli* infections may lead to kidney failure.

34.     Today, the plaintiff's symptoms have not resolved. The plaintiff continues to suffer from fatigue, stomach cramps, new food sensitivities, gas, bloating, and headaches.

### IV.     CAUSES OF ACTION

#### Strict Liability—Count I

35.     The defendant was, at all times relevant to this Complaint, the manufacturer and seller of the adulterated food product that is the subject of this action.

36.     The adulterated food product that the defendant manufactured, distributed, and sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli*, a deadly pathogen.

37.     The adulterated food product that the defendant manufactured, distributed, and sold

was delivered to the plaintiff without any change in its defective condition. The adulterated food product that the defendant manufactured, distributed and sold, was used in the manner expected and intended, and, as such, was consumed by the plaintiff.

38. The defendant owed a duty of care to the plaintiff to design, manufacture, and sell, a food product that was not adulterated, which was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendant breached this duty.

39. The defendant owed a duty of care to the plaintiff to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The defendant breached this duty.

40. As a direct and proximate result of the defendant's manufacture, distribution, and sale of a defective product in an unreasonably dangerous condition, the plaintiff sustained injuries and damages in an amount to be determined at trial.

## Breach of Warranty—Count II

41. The defendant is liable to the plaintiff for breaching express and implied warranties that it made regarding the adulterated food product that caused the plaintiff's injuries.

42. These express and implied warranties included the implied warranties of merchantability and fitness for a particular purpose, and the express warranty—through its sale of food to the public, and by the statements and conduct of its employees and agents—that the food product that it prepared and sold to the plaintiff, was fit for human consumption, and not otherwise adulterated or injurious to health.

43. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

44. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him was not fit for the purposes intended—*i.e.* human consumption—and that this food product was therefore in breach of the implied warranty of fitness for its intended purpose.

45. The plaintiff alleges that the food product that the defendant prepared was not fit for human consumption, was adulterated, and was injurious to health, and that this food product was therefore in breach of the express warranties made to him by the defendant.

46. As a direct and proximate cause of the defendant's breach of warranties, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### Negligence—Count III

47. The defendant owed the plaintiff a duty to use reasonable care in the manufacture, distribution, and sale of its food product. Compliance with this duty would have prevented or eliminated the risk that the defendant's food products would become adulterated with *E. coli*, or any other dangerous pathogen. The defendant breached this duty and, was therefore, negligent.

48. The defendant had a duty to properly supervise, train, and monitor its respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products. The defendant breached this duty and, was therefore, negligent.

49. The defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances and regulations, and that were clean, free from adulteration, and safe for human consumption. The defendant breached this duty and, was therefore, negligent.

50. As a direct and proximate result of the defendant's acts of negligence, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### **Negligence Per Se—Count IV**

51. The defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq.*), and the Oregon Food Sanitation Rules—Oregon Administrative Rules (OAR) 333-150-000.

52. The plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, and safety codes or provision pertaining to the manufacture, distribution, storage, and sale of food products.

53. The defendant failed to comply with the provisions of the health and safety acts identified above and, as a result, was negligent *per se* in its manufacture, distribution, and sale of a food product adulterated with *E. coli*, a deadly pathogen.

54. As a direct and proximate result of conduct by the defendant that was negligent *per se*, the plaintiff sustained injury and damages in an amount to be determined at trial.

### V.   DAMAGES

55. The plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the defendant, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to damages for: general pain and suffering, past and future; loss of enjoyment of life, past and future; medical and medical related expenses, past and future; travel and travel-related expenses, past and future; emotional distress, past and future; pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff prays for judgment against defendant as follows:

A.  Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiff as a result of the defendant's conduct;

B.  Ordering statutory prejudgment interest;

C.  Awarding plaintiff reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

D.  Granting all such additional relief as this Court deems just and equitable.

DATED:     November 6, 2015

        MARLER CLARK, LLP, PS

        /s/ Andrew Weisbecker
        Andrew Weisbecker, Esq., OSB No. 030491
        Attorneys for Plaintiff
        1301 Second Avenue, Suite 2800
        Seattle, WA 98101
        Telephone: 206-346-1888
        Fax: 206-346-1888
        aweisbecker@marlerclark.com